UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| **CHRISTINE VICTORIA WINKLES,** } } } | |
| Plaintiff, } } | |
| | } CASE NO. 6:11-cv-3763-SLB |
| v. } } | |
| **UNION BANKERS INSURANCE COMPANY, successor in interest to Pennsylvania Life Insurance Company,** } } } } } | |
| Defendant. } | |

# MEMORANDUM OPINION

The case is currently before the court on Defendant Union Bankers Insurance Company's Motion for Summary Judgment. (Doc. 13.)[1] In her Complaint, plaintiff Christine Victoria Winkles ("Winkles") asserts a claim for breach of contract against defendant Union Bankers Insurance Company ("Union Bankers"), alleging that it breached its insurance contract with her when it discontinued her disability benefits.[2] (Doc. 1-1 at 7-8.) Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that Union Bankers' Motion is due to be granted.

---

[1] Reference to a document number, ("Doc.___"), refers to the number assigned to each document as it is filed in the court's record.

[2] Winkles originally asserted a claim of bad faith against Union Bankers, but it was dismissed as untimely. (*See* doc. 11 at 6.)

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial.").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Therefore, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)). Therefore, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## II. STATEMENT OF FACTS[3]

**The Insurance Policy**

On October 17, 1983, Executive Fund Life Insurance Company ("Executive Fund") issued Winkles an Automobile and Hospital Policy (the "Policy"). (Doc. 13-1 at 4; doc. 13-3 at 53-55; *see also* doc. 13-4 at 2.)[4] At that time, Winkles was a Florida resident. (Doc. 13-1

---

[3] As required when evaluating a motion for summary judgment, the court states the facts and all reasonable inferences arising from them in the light most favorable to the plaintiff, as the nonmoving party. *See*, *e.g.*, *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[4] Though the Executive Fund insurance contract listed as Exhibit B to Union Bankers' Motion for Summary Judgment is in the name of Winkles's husband, Jerry Winkles, (*see* doc. 13-4 at 2), Winkles testified that she had her own policy, that the policies were originally

at 5; doc. 13-3 at 50-51.) Part Three of the Policy, entitled "TOTAL CONFINEMENT BENEFITS FOR LIFE," (the "Confinement Clause") provides insurance benefits under certain circumstances for an insured's total disability that results from bodily injury sustained in an automobile accident. (*See* doc. 13-4 at 2.) Specifically, benefits under the Policy are to be paid according to the following terms:

> If "Such Injury" as described in the Insuring Clause[5] and not hereinafter excepted shall within thirty days after the date of the accident continuously disable and prevent the Insured from performing any and every duty pertaining to any business or occupation, and as the result thereof is thereby necessarily confined within doors and requires regular and personal attendance by a currently licensed practitioner of the healing arts, other than himself, the Company will pay for any one accident an indemnity for one day or more at the rate shown in the application . . . so long as such total disability and such personal attendance and confinement continues even for life. Confinement shall not be considered terminated by reason of transportation of the Insured

---

purchased at the same time, and that they contained essentially the same language, (doc. 13-3 at 67-69). Only her husband's policy was produced because Winkles's had been destroyed in a house fire. (*Id.* at 67.) However, Union Bankers has not disputed the existence of the Policy.

[5] The Insuring Clause states that the insured is protected against "specified losses as herein limited and provided, from accidental bodily injury sustained while driving or riding within any automobile, truck or bus for business or pleasure, during the term of this policy, provided such bodily injuries are caused by reason of an automobile, truck or bus accident hereinafter called 'Such Injury.'" (Doc. 13-4 at 2.)

at the direction of his physician to or from a hospital or doctor's office for necessary treatment.

(*Id.*)

### Winkles's Car Accident and Injuries

On December 30, 1985, Winkles was in a car accident in Florida, and as a result of the accident, her left breast implant burst.[6] (*See* doc. 13-5 at 2-5; doc. 13-3 at 44-45.)[7] The implant, which was silicone, (doc. 13-3 at 43), was removed approximately a year later, (*id.* at 44-45). After the accident and a brief stay in the hospital, Winkles returned to her job as a waitress at Walt Disney World, first as a part-time employee after about a month, then as a full-time employee within four or five months. (*Id.* at 246-51.) She continued working there for several more years until February of 1991, (*id.* at 33-34, 38), when she went on medical leave to try "to find out what was wrong with me," (*id.* at 40), because she was

---

[6] Winkles got breast implants following a bilateral mastectomy in 1985 due to fibrocystic breast disease. (Doc. 16-1 at 67, 71.)

[7] Though Winkles's Complaint and deposition state that the accident occurred in 1983, (*see* doc. 1-1 ¶¶ 3-4; doc. 13-3 at 56-57), the Attending Physician's Report from the accident show that it took place in 1985, (doc. 13-5 at 2).

5

constantly tired and falling asleep, (*id.* at 38-40).[8]  Soon thereafter, Winkles and her husband moved to Alabama.  (*Id.* at 50-51; doc. 16-1 at 31.)

**Compensation under the Policy**

In 1994, after a visit from a Penn Life Insurance Company ("Penn Life") agent[9] who advised her that she may be able to recover benefits under the Policy, (*see* doc. 13-3 at 72-73; doc. 16-1 at 32), Winkles submitted a claim for disability benefits based on injuries from the 1985 accident, (*see* doc. 1-1 at 7, ¶ 4).  In March of 1995, Penn Life accepted liability dating back to February of 1991 and began paying Winkles disability benefits under the Total Confinement provision, including a lump sum representing benefits from February 1991 through March 1995.  (Doc. 16 at 8; doc. 16-1 at 34-35.)  In May of 1995, a second Penn Life representative visited Winkles's home to investigate her disability claim, (*see* doc. 16-1 at 31), and the company began issuing checks to her for "confining disability" benefits later that month.  (*See* doc. 16-1 at 29.)

---

[8] In addition to the 1985 car accident, Winkles fell down the stairs in December of 1990 while working, injuring her back. (Doc. 13-3 at 34-38.)  As a result of the fall, she received workers' compensation benefits from Disney World.  (*Id.* at 37.)  She took off work for approximately two weeks following the accident, returned to work in January of 1991, and as discussed above, left her employment in February of 1991 and relocated to Alabama. (*Id.* at 37-38, 50-51.)  Later, in June of 1991, Winkles fell a second time and broke her back.  (*Id.* at 63.)  She then filed for Social Security disability benefits, which she qualified for and began receiving at some point in 1991 or 1992.  (*Id.* at 61-64; doc. 16-1 at 32.)

[9] On June 30, 1996, Executive Fund Life Insurance Company, which had originally issued the Policy to Winkles, was merged into Penn Life.  (Doc. 1-2 ¶ 7.)  Penn Life then became the insurer on all Executive Fund Policies.  (*Id.*)  In 2011, Union Bankers, the defendant in this case, became the successor in interest to the liabilities of Penn Life.  (*Id.* ¶ 6.)

Penn Life continued paying benefits to Winkles for approximately ten years. (Doc. 13-3 at 74-75.) During that time, Winkles filed multiple reports regarding her disability, including information about her physical abilities and daily activities, (*see, e.g.*, doc. 16-1 at 4, 14, 16, 18, 20, 22, 24, 26, 28, 30), and Penn Life followed up with her on a periodic basis, (doc. 13-3 at 75). Winkles routinely reported that she engaged in bird watching, played Nintendo, played word games, sat in a swing outside, and watched television. (*See, e.g.*, doc. 16-1 at 4, 18, 22, 24, 26.) In addition, Penn Life was aware that Winkles regularly attended church, occasionally participated in activities away from home such as shopping, and owned twenty cows together with her husband. (Doc. 16-1 at 63, 69.) In February 1996, Penn Life informed Winkles that she qualified for waiver of premiums under the Policy, and her premiums were waived beginning March 16, 1996. (*Id.* at 5.)

**Winkles's Incarceration**

In 2003, Winkles was convicted of arson and sentenced to twenty years in prison. (Doc. 13-3 at 97-98.) She began her prison term in April of 2003 at Julia Tutwiler Women's Prison ("Tutwiler") in Wetumpka, Alabama. (*Id.* at 98-100.) Winkles was briefly moved from Tutweiler to a Louisiana prison before being transferred to a work release facility in Birmingham, Alabama, where she remained until 2008. (*Id.* at 103-05, 109.) In order to be admitted into the work release program, Winkles was required to complete an Assessment for Pre-Employment Screening, where she indicated that she had the following skills:

"machine operator[,] king bearer, making car parts[,] spark plugs[,] printed circuit boards[, and] soldering.  (Doc. 13-3 at 122-26; doc. 13-6 at 2.)

Ultimately, Winkles worked as a van driver, driving other inmates to and from their jobs in a fifteen-passenger van.  (Doc. 13-3 at 110-11.)  In accordance with this responsibility, she signed forms indicating that she was capable of performing the duties required to be a van driver, including following designated routes, filling the van with gas, cleaning the van after trips, and securing the van upon return to the work release facility.  (Doc. 13-9 at 2; doc. 13-10 at 2; doc. 13-3 at 158-59.)  Despite signing these agreements, Winkles maintains that she did not affirmatively sign up for the work release program and that she was forced to drive the van.  (Doc. 13-3 at 106, 107, 131.)[10]  In addition, Winkles was given a defensive driving evaluation where she was rated as either satisfactory or unsatisfactory in several different categories; she scored satisfactory in every category, in addition to receiving an overall score of satisfactory.  (Doc. 13-7 at 2.)  She also testified that "I made one of the highest scores on the defensive driving, like a state trooper would take." (*Id.* at 129-30.)  However, during her time as a van driver, Winkles was involved in three car

---

[10] Winkles testified that "[t]hey sent me [to work release].  I didn't sign up for that . . . . They sent me to work release, because they needed my bed empty."  (Doc. 13-3 at 107.) However, she later discussed how she came to be a part of the work release program, testifying that the work classification officer came to the Louisiana prison where she was located, and that because her mother was ill, she told him "get me back in the State of Alabama.  I don't care if you have to put me underneath the bed or I have to share a bed or whatever, just get me back to the state of Alabama because my mom is in bad health . . . ."  (*Id.* at 261-64.)

accidents, two of which occurred because her foot slipped off of the brake pedal, and one of which occurred because she fell asleep at the wheel. (*Id.* at 268-69.)

While part of the work release program, Winkles was periodically permitted to leave the facility for four to seventy-two hours at a time to visit with her family. (Doc. 13-3 at 132-37, 145.) During these leaves, she ate at restaurants with her brother, sat in the park, went to K-Mart, and traveled home to Addison, Alabama. (*Id.* at 140-43, 196; doc. 13-12 at 2; doc. 13-13 at 2.) In June of 2005, while still incarcerated at the work release facility, Winkles submitted a standard "Activities of Daily Living Questionnaire" to Penn Life stating that "my leg gives []way occasionally" when driving and that "I don't travel except for necessary trips." (Doc. 16-1 at 54.)

### Cancellation of Policy Benefits

On September 21, 2005, Penn Life notified Winkles that her benefits under the Policy were being terminated because she "no longer satisf[ied] the . . . policy definition of *disability*." (Doc. 13-14 at 2 (emphasis in original).) The company's letter stated that the Department of Corrections had informed it that she had been performing duties as a full-time van driver and that "[s]ince you are actually engaged in performing these services, you can not [sic] be considered unable to perform them . . . ." (Doc. 13-14 at 3.) Winkles testified that after the termination of her benefits, she paid premiums on the Policy until 2007, but that she paid no premiums once she got out of prison. (Doc. 13-13 at 203.) On November 15,

9

2006, Penn Life sent a letter to Winkles stating that her policy had lapsed due to the non-payment of premiums. (Doc. 13-15 at 2.)

Winkles filed her Complaint in Alabama state court,[11] alleging a breach of contract claim against Union Bankers, as the successor in interest to Penn Life. (Doc. 1-1 at 8, ¶¶ 16-18.) She claims that Union Bankers wrongfully terminated her disability without investigation and that it continues to refuse to reinstate her disability benefits. (*Id.* ¶¶ 6-15.) Subsequently, Union Bankers filed a Motion for Summary Judgment, (*see* doc. 13), and Memorandum of Law in Support, (doc. 13-1), which is currently before the court.

### III. DISCUSSION

As a preliminary matter, the court must determine which state's law governs this case. *See St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 895 (11th Cir. 2009) ("A federal court sitting in diversity, as in this case, must apply the choice of law principles of the state in which it sits."). Alabama follows the rule of *lex loci contractus*. *Cherokee Ins. Co., Inc. v. Sanches*, 975 So. 2d 287, 292 (Ala. 2007). Under this rule, if the contract itself does not specify which jurisdiction's law is to apply, the court applies the "law of the state where the contract was formed." *Id.* (quoting *Cherry, Bekaert & Holland v. Brown,* 582 So. 2d 502, 506 (Ala. 1991)); *St. Paul Fire & Marine Ins. Co.*, 572 F.3d at 895 ("Alabama follows the principle of *lex loci contractus*, applying the law of the state where the contract was formed."). Jerry Winkles's insurance policy provided to the

---

[11] Union Bankers timely removed the lawsuit to federal court. (*See* doc. 1 at 1, 12.)

court states that it was "Dated at Ocoee, FLA," (doc. 13-4 at 2), and Winkles's testimony indicates that the Policy was executed while she was living in Florida and working at Walt Disney World, (doc. 13-3 at 51-52). Further, Union Bankers asserts that Florida law applies in this case, (doc. 13-1 at 13, n. 4), and Winkles has not contested that assertion. Accordingly, the court agrees that Florida law governs this case.

In its Motion for Summary Judgment, Union Bankers makes four principal arguments, alleging that Winkles does not satisfy, nor has she ever satisfied, the requirements of the Policy's Confinement Clause. It argues that (1) Winkles was not "necessarily confined within doors" under the terms of the Policy, (2) because she worked as a van driver, she was not unable to perform "any and every duty pertaining to any business or occupation," (3) she was never "continuously" disabled due to her 1985 car accident, and (4) her alleged disability did not manifest itself within thirty days of the accident as required by the Policy. (Doc. 13 at 2.)

In her Response, Winkles argues that genuine issues of material fact exist as to whether she was and continues to be "necessarily confined within doors" and whether she was and continues to be "prevent[ed] . . . from performing any and every duty pertaining to any business or occupation." (Doc. 16 at 16, 22.)[12] She further argues that Union Bankers

---

[12] Though the section of her Response where she makes this argument is labeled "Genuine issues of material fact exist as to whether Plaintiff was *continuously disabled* as required by the policy at issue," (doc. 16 at 16 (emphasis added)), the section does not directly address whether plaintiff was "continuously disable[d]" under the terms of the Policy, (*see* doc. 16 at 16-27).

is barred by the doctrine of waiver from arguing (1) that she was not continuously disabled and (2) that she was not totally disabled within thirty days after the 1985 accident. (*Id.* at 28.) Specifically, she alleges that because Penn Life was aware of the "pertinent material facts" of her claim at the time it began paying the disability benefits, including the date of the accident that caused her injuries and that she had worked after the accident, and because it paid her benefits for approximately ten years despite knowing these facts, it waived its right to terminate benefits on either of those bases. (*Id.* at 28-31.)

Finally, in its Reply, Union Bankers counters that the requirements under the Policy that the disability must be both continuous and occur within thirty days of a car accident are preconditions to coverage and therefore cannot, under Florida law, be waived by an insurer. (Doc. 18 at 6-7.) It outlines the distinction between coverage provisions and forfeiture provisions, noting that the former "cannot be waived by an insurer and can be raised at any time." (*Id.* at 5.) This argument is persuasive and supported by law. Therefore, the court agrees with Union Bankers: because Florida law makes clear that waiver cannot be applied to expand the scope of the insurance coverage provision in this case, Winkles cannot recover under the Policy. Accordingly, the court chooses only to address the dispositive issue of waiver below and does not address Union Bankers' additional arguments at this time.[13]

---

[13] However, the court certainly questions whether Winkles would be able to survive summary judgment under any of the additional arguments raised by Union Bankers, given her allegedly active participation in the work release program.

**Waiver under Florida Law**

Though waiver initially seems a persuasive argument based on the facts of Winkles's case,[14] Florida law on this issue has been settled for quite some time. Florida District Courts of Appeal have long followed the rule that "[w]hen considering waiver, conditions going to the coverage or scope of a policy are distinguished from those furnish[ing] a ground for forfeiture." *Reliance Mut. Life Ins. Co. of Ill. v. Booher*, 166 So. 2d 222, 226 (Fla. 2d DCA 1964) (citing *Reisman v. N.H. Fire Ins. Co.*, 312 F.2d 17 (5th Cir. 1963)). Later, in *Six L's Packing Co. v. Florida Farm Bureau Mutual Insurance Co.*, 276 So. 2d 37 (Fla. 1973), the Florida Supreme Court adopted a waiver decision from the Fourth District Court of Appeal as its own. *Id.* at 38. The Fourth District's case stated that "[t]he general rule is well established that the doctrine of waiver and estoppel based upon the conduct or action of the insurer (or his agent) is [n]ot applicable to matters of Coverage as distinguished from grounds for Forfeiture." *Six L's Packing Co., Inc. v. Fla. Farm Bureau Mut. Ins. Co.*, 268 So. 2d 560, 563 (Fla. 4th DCA 1972) *opinion adopted*, 276 So. 2d 37 (Fla. 1973). Thus, while coverage provisions may not be expanded because of waiver or estoppel, Florida law states that "an insurer may be estopped by its conduct from seeking a *forfeiture* of a policy." *Lloyds Underwriters at London v. Keystone Equip. Fin. Corp.*, 25 So. 3d 89, 92 (Fla. 4th

---

[14] Winkles's argument discussing waiver as the "intentional relinquishment or abandonment of a known right or privilege" and listing the elements of waiver under Florida law at first appears to apply to her case. (Doc. 16 at 28.) However, a closer examination reveals that the first element of waiver, "the waiver of a right, privilege, advantage, or benefit *which may be waived*," (*id.* (emphasis added) (quoting *Bristol W. Ins. Co. v. Albertson*, 41 So. 3d 378, 381 (Fla. 4th DCA 2010))), cannot be satisfied here.

DCA 2009) (emphasis added) (quoting *Six L's Packing Co. v. Fla. Farm Bureau Mut. Ins. Co.*, 268 So. 2d 560, 563 (Fla. 4th DCA 1972)). This is the distinction that ultimately prevents Winkles from recovering under the Policy.[15]

The difference between provisions of coverage and provisions of forfeiture is fairly simple in most cases. *Lloyds Underwriters at London v. Keystone Equipment Finance Corporation*, 25 So. 3d 89, 92 (Fla. 4th DCA 2009), a case that Union Bankers relies upon extensively, provides a helpful explanation of which provisions constitute "coverage" provisions and which constitute "forfeiture" provisions. At a general level, provisions "where [the insurer] expressly and specifically declined to assume such a risk" are coverage

---

[15] It is worth noting that there is an exception to this rule under Florida law. The Florida Supreme Court has held that promissory estoppel, "a qualified form of equitable estoppel which applies to representations relating to a future act of the promisor rather than to an existing fact," acts as an "exception to the general rule." *Crown Life Ins. Co. v. McBride*, 517 So. 2d 660, 661-62 (Fla. 1987); *see also Doe on Behalf of Doe v. Allstate Ins. Co.*, 653 So. 2d 371, 374 (Fla. 1995) (confirming continued existence of the exception in answering a certified question from the Eleventh Circuit). Winkles has argued only waiver in this case; however, even analyzing her case under the estoppel exception, she cannot survive summary judgment. A plaintiff may only recover under a promissory estoppel theory in Florida where the refusal to enforce a promise (even though not supported by consideration) "would be virtually to sanction the perpetration of fraud or would result in other injustice." *Crown Life Ins. Co.*, 517 So. 2d at 662 (quoting *Se. Sales & Serv. Co. v. T.T. Watson, Inc.*, 172 So. 2d 239, 241 (Fla. 2d DCA 1965)) (internal quotation marks omitted). The Florida Supreme Court has further stated that "[s]uch injustice may be found where the promisor reasonably should have expected that his affirmative representations would induce the promisee into action or forbearance substantial in nature, and where the promisee shows that such reliance thereon was to his detriment." *Id.* at 662 (citing *Mount Sinai Hosp. of Greater Miami, Inc. v. Jordan*, 290 So. 2d 484 (Fla. 1974)). Winkles has not pointed the court to a specific promise that was made to her by Union Bankers. However, even if Union Bankers' payments over the years could be construed as some sort of promise to Winkles, she has also presented no evidence of detrimental reliance. Therefore, "[i]n short, [Winkles] did not prove that [she took some action in reliance that] was to h[er] detriment or that refusal to enforce the . . . promise would sanction the perpetration of a fraud." *Id.*

provisions and cannot be waived by the insurer. *Lloyds Underwriters at London*, 25 So. 3d at 92 (quoting *Peters v. Great Am. Ins. Co., N.Y.*, 177 F.2d 773, 779 (4th Cir. 1949)). More specifically, coverage provisions "are inclusionary or exclusionary, . . . outline the scope of coverage, or . . . delineate the dollar amount of liability." *Id.* at 92-93 (quoting *Creveling v. Gov't Emp. Ins. Co.*, 828 A.2d 229, 244-45 (Md. 2003)). Conversely, forfeiture provisions "are invoked to avoid liability for existing coverage" and "often include provisions such as filing a timely notice of claim and submitting proofs of loss." *Id.* (quoting *Creveling v. Gov't Emp. Ins. Co.*, 828 A.2d 229, 244-45 (Md. 2003)).

Union Bankers conveys the distinction well in its Reply when it differentiates between a forfeiture provision and a coverage provision, noting that

> [a] coverage provision is one that . . . sets forth the preconditions for coverage or that otherwise governs the scope of coverage. In contrast, where coverage *already exists* for a loss, a forfeiture provision is one that requires some action by the insured that, if not complied with, will result in the forfeiture of coverage . . . .

(Doc. 18 at 6 (emphasis in original).) Thus, for example, in *Lloyds Underwriters at London*, the court held that

> Despite Lloyds' argument to the contrary . . . the garaging warranty in the instant case is a provision of forfeiture-not one of coverage. Loss due to theft was plainly covered by the policy and a risk for which a premium was paid. The garaging warranty provides for the loss, or forfeiture, of that coverage should the insured fail to behave in a particular manner and comply with its provisions concerning the storage of the tractor-trailer. . . . [P]ayment for the loss of the tractor-trailer due to theft was clearly within the bounds of the policy and application of the doctrine of estoppel would not serve to create or extend coverage.

*Lloyds Underwriters at London*, 25 So. 3d at 93. Similarly, in *State Liquor Stores No. 1 v. United States Fire Insurance Co.*, 243 So. 2d 228 (Fla. 1st DCA 1971), the court held that a robbery insurance policy provision which provided coverage for a business's property when there was a robbery "outside the premises while being conveyed by a messenger," could not be expanded by waiver. *State Liquor Stores No. 1*, 243 So. 2d at 230-35. The court noted that "[i]t must be recognized that there is substantial difference in law between . . . representations concerning the scope and extent of coverage to be afforded by an insurance policy . . . [, and] representations waiving forfeiture provisions of a policy . . . ." *Id.* at 233. Accordingly, the court held that an insurance agent's knowledge of how the company completed its business prior to the issuance of the policy[16] could not expand the scope of the provision to include property that was not being "conveyed by a messenger" at the time of the robbery. *Id.* at 233-35. At bottom, "the terms of the policies [were] clear and unambiguous." *Id.* at 234-35.[17]

---

[16] The company president's practice was to gather all funds and take them home with him, then deposit them in the bank the next day. *State Liquor Stores No. 1*, 243 So. 2d at 229.

[17] Union Bankers also cites additional cases that provide useful illustrations of Florida's rule against expanding insurance coverage through waiver. (*See* doc. 18 at 7.) For example, in *Campbell v. Prudential Insurance Co.*, 480 So. 2d 666 (Fla. 5th DCA 1985), the appellate court held that the insurer could not be estopped from recovering $3,407.73 in overpaid disability benefits based on the argument that the insurer had waived the set-off provisions of the policy by making the overpayments. *Id.* at 667. The court held that "[i]nsurance coverage cannot be extended by applying doctrines of waiver and estoppel to restrictions and limitations on coverage." *Id.*

In Winkles's case, the specific provision at issue states that benefits will be paid under the policy if "'Such Injury' . . . shall within thirty days after the date of the accident continuously disable and prevent the Insured from performing any and every duty pertaining to any business or occupation . . . so long as such total disability and such . . . confinement continues . . . ." (Doc. 13-4 at 2.) As discussed earlier, Winkles argues that because Penn Life was aware of the material facts and chose to pay her despite the language in its Policy, it has waived the right to assert certain arguments. (Doc. 16 at 28-31.) However, Union Bankers argues that the Policy requirements, specifically the requirements of disability within thirty days and continuous disability thereafter, are conditions which must be met for the coverage to exist and are therefore coverage provisions that *cannot* be waived. (Doc. 18 at 6-7.)

Union Bankers is correct. As in the Florida cases discussed above, here the thirty-day and continuous disability requirements are coverage provisions "outlin[ing] the scope of coverage" under the Policy and cannot be waived. *Lloyds Underwriters at London*, 25 So. 3d at 92 (quoting *Creveling v. Gov't Emp. Ins. Co.*, 828 A.2d 229, 244-45 (Md. 2003)). Because the Policy language requires that Winkles become totally disabled within thirty days after an accident (a relatively short time period), and remain continuously disabled, it is clear that the type of injury Winkles claims to have incurred—a long term and slowly manifesting disability—was not within the risk assumed by the insurance company when the Policy was issued. *See id.* at 92. Moreover, the limitation of coverage to confining disabilities occurring

within thirty days of a covered accident and continuing thereafter was presumably in place to *purposefully exclude* the very type of injury that Winkles is claiming: namely, one where the actual cause would be difficult to prove. By including a thirty-day continuous disability requirement, an insurance company limits its coverage to confining disabilities which it can be fairly certain have directly resulted from the covered accident. Thus, because the Confinement Clause requirements are plainly coverage provisions, and because Winkles was not continuously disabled by her accident as required under the language of the Clause, she is not covered under the Policy.[18] (*See* doc. 13-3 at 247 (stating that Winkles went back to work at Disney after the 1985 accident); *id.* at 33 (stating she worked at Disney from 1977 to 1992).)

Moreover, in addition to defining the scope of coverage, it is clear that the Confinement Clause does not in any way operate as a forfeiture provision. For example, it is not a method by which Union Bankers could "avoid liability for existing coverage" based on a technicality. *Lloyds Underwriters at London*, 25 So. 3d at 93. Further, it does not depend on any action that Winkles as the insured was required to take; she did not "fail to

---

[18] Though Union Bankers argues that Winkles was not disabled within *thirty days* after the accident, (doc. 13-1 at 28), and Winkles has not contested this but has only argued that the issue is waived, (doc. 16 at 28), the court makes no determination on the issue at this point. The evidence cited by Union Bankers indicates only that she continued to work after her 1985 car accident, (*see* doc. 13-3 at 32-35). However, other portions of her deposition show that she possibly did not return to work for a full month after the accident. (*Id.* at 248-49.) Regardless, even if Winkles was totally disabled within the thirty-day window required by the Policy, the unrefuted evidence shows that she was not continuously disabled, and therefore, she cannot recover.

behave in a particular manner and comply with its provisions concerning [her alleged disability]." *Id*. On the contrary, Winkles simply does not meet the requirements laid out very plainly in the language of the Confinement Clause, and thus, her alleged total disability does not fall within the scope of coverage. To interpret the requirements otherwise would expand the coverage under the Policy to include circumstances beyond the listed requirements, and Florida law clearly prohibits such an expansion. *See Lloyds Underwriters at London,* 25 So. 3d at 92. As one court very aptly put it, "[i]t would be unjust to . . . the insurance carrier if the law were that when the insurance carrier once undertakes to provide medical or other care for an [insured] it has lost all right to afterwards defend against what it believes to be an unjust or illegal claim." *Larson v. Wycoff Co.*, 624 P.2d 1151, 1155 (Utah 1981) (quoting *Harding v. Indus. Comm'n of Utah*, 28 P.2d 182, 184 (Utah 1934)).

Winkles has not contested Union Bankers' assertion that she was not continuously disabled within thirty days of the 1985 accident. (*See* doc. 16 at 3, 28.) Instead, she has only argued that Union Bankers waived its right to raise these issues by paying benefits under the Policy for approximately ten years, despite having knowledge of Winkles's circumstances throughout the course of her coverage. (*Id.* at 29.) For the reasons discussed above, this argument fails under the relevant law. Accordingly, issues of whether Winkles was "necessarily confined within doors" and "prevented from performing any and every duty pertaining to any business or occupation" need not be decided, and Union Bankers is entitled to judgment as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, the court finds that Defendant Union Bankers Insurance Company's Motion for Summary Judgment, (doc. 13), is due to be granted with respect to Winkles's breach of contract claim.  An order granting Union Bankers' Motion will be entered contemporaneously with this Opinion.

**DONE**, this 29th day of July, 2013.

*Sharon Lovelace Blackburn*
_____
SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE